# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DEMETRIA TAYLOR,

                Plaintiff,

        v.                               Case No. 19-CV-359

ANDREW M. SAUL,
Commissioner of the Social Security Administration,

                Defendant.

## DECISION AND ORDER

### 1. Introduction

Plaintiff Demetria Taylor alleges she has been disabled since May 19, 2009 (Tr. 13), and, therefore, seeks disability insurance benefits. She subsequently changed her alleged date to September 30, 2012. (*Id.*) After her application was denied initially (Tr. 94-108) and upon reconsideration (Tr. 110-25), a hearing was held before an administrative law judge (ALJ) on December 7, 2017 (Tr. 43-93). On June 29, 2018, the ALJ issued a written decision concluding that Taylor was not disabled. (Tr. 13-32.) After the Appeals Council denied Taylor's request for review on February 5, 2019 (Tr. 1-4), she filed this action. All parties

have consented to the full jurisdiction of a magistrate judge (ECF Nos. 3, 5), and the matter is ready for resolution.

## 2.  ALJ's Decision

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). The ALJ found that Taylor "did not engage in substantial gainful activity during the period from her alleged onset date of September 30, 2012 through her date last insured of December 31, 2017[.]" (Tr. 15.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1522(a). The ALJ concluded that Taylor has the following severe impairments: "degenerative disc disease, degenerative joint disease, fibromyalgia, obesity, major depressive disorder, anxiety disorder, and post-traumatic stress disorder[.]" (Tr. 16.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. If the impairment or impairments meets or

medically equals the criteria of a listing and also meets the twelve-month durational requirement, 20 C.F.R. § 404.1509, 416, the claimant is disabled. 20 C.F.R. § 404.1520(d). If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. 20 C.F.R. § 404.1520(e). The ALJ found that "[t]hrough the date last insured, [Taylor] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments[.]" (Tr. 17.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the most the claimant can do despite her impairments. 20 C.F.R. § 404.1545(a)(1). In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. § 404.1545(a)(2). In other words, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. The ALJ concluded that Taylor has the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) except [Taylor] is limited to no climbing of ladders, ropes or scaffolds; frequent climbing of ramps or stairs; and, frequent stooping, crouching, kneeling and crawling. [Taylor] requires a sit/stand option allowing change of position every thirty minutes. She is limited to unskilled work (SVP 1 or 2) performing simple, routine and repetitive tasks; occasional changes in her work setting; occasional interaction with coworkers and the public; and, no fast-paced production work.

(Tr. 19.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560. Taylor's past relevant work was "a consumer case coordinator, medical technician, patient transporter, cardiac monitor, and office manager." (Tr. 30.) The ALJ concluded that Taylor "was unable to perform any past relevant work[.]" (*Id.*)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c). At this step, the ALJ concluded that "there were jobs that existed in significant numbers in the national economy that [Taylor] could have performed[.]" (Tr. 30.) In reaching that conclusion, the ALJ relied on testimony from a vocational expert (VE), who testified that a hypothetical individual of Taylor's age, education, and work experience could perform the requirements of occupations such as surveillance systems monitor, lamp shade assembler, and machine tender/stuffer machine of toys and sporting equipment. (Tr. 31.) After finding that Taylor could perform work in the national economy, the ALJ concluded that she was not disabled. (Tr. 31-32.)

### 3. Standard of Review

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial

evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder*, 529 F.3d at 413).

**4.  Analysis**

Taylor argues that the ALJ erred by determining that her subjective statements were not consistent with the medical record; by not accounting for her concentration, persistence, and pace limitations, upper extremity limitations, and interpersonal deficits in the RFC assessment; and by assigning "little weight" to her treating providers: Dr. David Coran, Dr. Richard Hariman, Dr. Kathryn Kreig, and Lisa Roehl. (ECF No. 11 at 8-24.) She also requests that, if this case is remanded, the court should recommend that it be assigned to a different ALJ. (*Id.* at 25-28.) Finally, she asks for a direct award of benefits. (*Id.* at 28.)

### 4.1. Credibility Determination

In making his RFC determination the ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304 at *3; *see also* 20 C.F.R. § 404.1529. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities.…" SSR 16-3p, 2017 WL 5180304 at *3. The ALJ's evaluation of a claimant's symptoms is entitled to "special deference" and will not be overturned unless it is "patently wrong." *Summers*, 864 F.3d at 528 (citing *Eichstadt v. Astrue*, 534 F.3d 663, 667-68 (7th Cir. 2008)).

Taylor argues that the ALJ's reasons for determining that her statements are "not entirely consistent" with the evidence were not good reasons. (ECF No. 11 at 9-15.) The ALJ offered the following boilerplate:

> [A]fter careful consideration of the evidence, the undersigned finds that while [Taylor's] medically determinable impairments could reasonably be expected to cause the alleged symptoms, [Taylor's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence for the reasons stated in this decision.

(Tr. 22.)

6

As is so often the case, the ALJ failed to build an accurate and logical bridge between the conclusion set forth in the boilerplate and the evidence. What followed the boilerplate conclusion was simply a general discussion of the evidence. "An ALJ does not comply with his obligation to provide 'specific reasons for the weight given to the individual's symptoms,' SSR 16-3p, by merely recounting the medical evidence and stating a conclusion. The ALJ must connect that medical evidence to his conclusions .…" *Krevs v. Saul*, No. 18-CV-1742, 2020 WL 58068, at *2 (E.D. Wis. Jan 6., 2020). From the ALJ's discussion of the evidence the court can glean possible reasons for his conclusion that Taylor's symptoms were not as severe as she alleged. But the court can also identify many reasons for crediting Taylor's statements regarding the severity of her symptoms. The ALJ generally failed to explain why he credited some evidence over contrary evidence.

Regarding her mental limitations, the ALJ cited to Taylor's mental status examinations. He stated, "[Taylor's] mental status examinations reveal abnormalities of mood and affect, but otherwise good cognitive and social function." (Tr. 22.) He further explained that some exams "documented constricted, sad, depressed, anxious, guarded, restricted and/or worried mood and affect, but cooperative behavior, adequate grooming, normal psychomotor activity, normal speech, logical and goal-directed thoughts, intact attention and concentration, and fair to good insight and judgment[.]" (*Id.*) The ALJ never explained why he weighed evidence that Taylor was doing well more heavily than evidence that might indicate a disability. And, as Taylor argues, "mental status

7

examinations that reveal abnormalities in mood and affect … tend to support rather than detract from Taylor's allegations and should not be overlooked or minimized." (ECF No. 11 at 10.) *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.") (citing *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)).

In terms of Taylor's physical limitations, the ALJ repeatedly cited findings that Taylor seemed to be in "no acute distress." (Tr. 23.) But that finding glosses over many of Taylor's complaints at her physical examinations. (*See, e.g., id.* ("In July, she had a painful area over her right hip, but was pleasant and in no acute distress and demonstrated full hip range of motion and normal seat, gait and stance.) The Commissioner argues that "the ALJ acknowledged that at times, [Taylor] had tenderness, limited range of motion, an antalgic gait, a mild limp, crepitus, discomfort when moving from a seated to standing position, diminished strength, crepitus [sic], and positive trigger points[.]" (ECF No. 14 at 6 (internal citations omitted).) However, it is not enough for the ALJ to simply acknowledge these symptoms; he must explain why he is not accounting for them in his RFC finding. *See Moore*, 743 F.3d at 1123 (citing *Indoranto*, 374 F.3d at 474).

Taylor also argues that the ALJ erred in relying on Taylor's desire to have a child as evidence of her own opinion of her health and ability to engage in full-time work. (ECF No. 11 at 14.) She argues that "the ability to have and care for a child is not analogous to

the rigors of full time, competitive work such that [her] desire to engage in the former evinces an ability to engage in the latter." (ECF No. 11 at 14 (footnote omitted).)

While an ALJ can consider a claimant's daily activities in evaluating how her symptoms may limit her ability to work, 20 C.F.R. § 404.1529(c)(3)(i), household chores and work activities are not necessarily interchangeable. *See Hughes v. Astrue*, 705 F.3d 276, 278-79 (7th Cir. 2013); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (finding that the ALJ's "casual equating of household work to work in the labor market cannot stand"). The United States Court of Appeals for the Seventh Circuit has cautioned ALJs against placing undue weight on a claimant's household activities in assessing her ability to hold a job outside the home. *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) (citing *Gentle*, 430 F.3d at 867; *Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005); *Kelley v. Callahan*, 133 F.3d 583, 588-89 (8th Cir. 1998); *Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996)). And "[a] more important point is that taking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not." *Gentle*, 430 F.3d at 867. Accordingly, it was error for the ALJ to rely on Taylor's desire to have a child as evidence that she was capable of full-time employment.

Taylor also argues that the ALJ's reliance on her EEOC complaint as evidence that she could engage in full-time work was "misplaced." (ECF No. 11 at 14-15.) The ALJ stated, "[t]here is a dichotomy between [Taylor's] allegations that she is capable of performing her job under the EEOC rules and regulations and the allegations that she is

incapable of performing work under the Agency disability rules and regulations." (Tr. 25.) But in that complaint Taylor alleged that her employer had failed to accommodate her restriction to part-time work. (ECF No. 11 at 14-15.)

In response to this argument the Commissioner does not dispute that the ALJ's reliance on the EEOC complaint was improper. Instead, the Commissioner states, "[e]ven if this discussion did not support the ALJ's conclusions, its inclusion does not render the entirety of the ALJ's subjective symptom evaluation patently wrong." (ECF No. 14 at 9.) The Commissioner points to *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) (unpublished), which states, "Not all of the ALJ's reasons must be valid as long as *enough* of them are[.]" (Emphasis in original.) However, the court has concluded that the other reasons given by the ALJ were not valid reasons, or at least not sufficiently explained.

Accordingly, on remand the ALJ shall reconsider whether Taylor's medically determinable impairments could reasonably be expected to cause her alleged symptoms and, if so, the ALJ shall reevaluate the intensity, persistence, and limiting effects of those symptoms.

### 4.2. RFC Assessment

Taylor also argues that the ALJ erred by not including in the RFC her moderate limitation in maintaining concentration, persistence, and pace; her upper extremity deficits; and her interpersonal deficits. (ECF No. 11 at 15-19.)

### 4.2.1. Concentration, Persistence, and Pace

It is well-established that "[b]oth the RFC and the hypothetical question presented to a VE [vocational expert] must incorporate the 'totality of a claimant's limitations,' including any 'deficiencies of concentration, persistence and pace.'" *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) (unpublished) (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)). "The ALJ need not use this exact terminology, so long as the phrasing 'specifically exclude[s] those tasks that someone with the claimant's limitations would be unable to perform.'" *Id.* (quoting *O-Connor-Spinner*, 627 F.3d at 619) (alteration in original); *see Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) ("Though particular words need not be incanted, we cannot look at the *absence* of the phrase 'moderate difficulties with concentration, persistence, and pace' and feel confident this limitation was properly incorporated in the RFC and in the hypothetical question.") (Emphasis in original).

Taylor argues that, although the ALJ found she was moderately limited in concentration, persistence, and pace, this limitation is not adequately accounted for in the RFC. (ECF No. 11 at 16-17.) In response, the Commissioner argues that the RFC does address her moderate limitation and that "[t]he ALJ explained that the mental limitations in the RFC assessment were based on normal concentration and attention in examinations, [Taylor's] care for her child, and opinions from psychological experts[.]" (ECF No. 14 at 11.)

11

The ALJ stated that he

> addresse[d] [Taylor's] mental health disorders and associated moderate limitations across the "paragraph B" criteria by limiting [Taylor] to unskilled work (SVP 1 or 2) performing simple, routine and repetitive tasks; occasional changes in her work setting; occasional interaction with coworkers and the public; and, no fast-paced production work. These limitations further address [Taylor's] fatigue associated with her fibromyalgia.

(Tr. 21-22.) He further stated that "[t]hese findings adequately address the moderate limitations Drs. Pape and Phillip [sic] assigned as well as Dr. Pape's concerns for [Taylor's] need for simple and routine tasks and low stress work that is not fast-paced in nature." (Tr. 27.) State agency psychological consultants Dr. Deborah Pape and Dr. Russell Phillips had both opined that Taylor was moderately limited in her "ability to carry out detailed instructions," in her "ability to maintain attention and concentration for extended periods," in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," and in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 105, 122.)

The ALJ's RFC assessment included limitations "to unskilled work (SVP 1 or 2) performing simple, routine and repetitive tasks; occasional changes in her work setting; occasional interaction with coworkers and the public; and, no fast-paced production work." (Tr. 19.) "Even generic limitations, such as limiting a claimant to simple, repetitive

12

tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they 'adequately account for the claimant's demonstrated psychological symptoms' found in the record." *Urbanek v. Saul*, No. 19-1394, 796 F. App'x 910, 914 (7th Cir. 2019) (unpublished). However, the ALJ's RFC assessment does not adequately address the limitations found by Taylor's medical providers. "[The United States Court of Appeals for the Seventh Circuit] [has] repeatedly rejected the notion that a hypothetical like the one here 'confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Varga v. Colvin*, 794 F.3d 809, 814-15 (7th Cir. 2015) (quoting *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014)). Although the RFC includes more limitations than just "simple, routine and repetitive tasks," the additional limitations address Taylor's social functioning and workplace adaptation rather than deficiencies in concentration, persistence, and pace. *Id.* at 815 ("'Few if any work place changes' with limited 'interaction with coworkers and supervisors' deals largely with workplace adaptation rather than concentration, pace, or persistence.").

Accordingly, on remand the ALJ shall ensure that Taylor's moderate limitation in concentration, persistence, and pace are incorporated into the RFC assessment.

### 4.2.2. Upper Extremity Deficits

Taylor argues that the RFC does not adequately address her upper extremity deficits. (ECF No. 11 at 17-18.) She argues that the record contains the following evidence of upper extremity impairment:

- April 2013: has had neck pain for several years, neck pain radiates into both shoulders; occasional numbness and tingling in the upper extremities, worse with prolonged activity[;]
- June 2013: neck pain with paresthesias to the bilateral upper extremities along with numbness and tingling in both hands[;]
- July 2013: still having numbness and tingling in the hands[;]
- October 2015: episodic discomfort in hands (and feet) with episodes of swelling; reports that, at times, her hand [sic] look like they are puffed; on exam, some puffiness in the hands[;]
- January 2016: has an array of photos, revealing hand discoloration and hand swelling[;]
- September 2016: wrists hurt with movement; hands with palmar stabbing pain; hands and feet swell at night; hand weakness with opening pill bottles[;]
- November 2016: seen for urgent evaluation of bilateral hand pain and swelling; intermittent numbness; on exam, tenderness of PIP and DIP joints, swelling of bilateral medial hands, wrist tenderness[;]
- January 2017: increased pain in—in part—wrists and hands; bilateral hand tenderness[;]
- January 2017: wrists feel swollen; on exam, wrist tenderness[;]
- January 2017: fitted for bilateral wrist orthoses[;]
- February 2017: wrists feel swollen[;]
- September 2017: neck pain (left side worse than right) and left upper arm pain (to the elbow); intermittent tingling into the left forearm[.]

Further, Dr. Hairman [sic]—in his July 2017 assessment—opines that Taylor can perform bilateral handling "occasionally."

(*Id*.) In response, the Commissioner argues that "the ALJ acknowledged [Taylor]'s complaints of hand pain and other symptoms, but reasonably found a limitation to

sedentary work, which significantly limited [Taylor]'s ability to lift and carry, was appropriate[.]" (ECF No. 14 at 13 (internal citation and footnote omitted).)

In discussing Taylor's severe impairments, the ALJ said the following about her upper extremity limitations:

> The undersigned considered [Taylor]'s migraines, degenerative process of the hands, feet and neck, but these conditions do not cause more than minimal limitation in [Taylor's] ability to perform basic work activities and are therefore nonsevere.
>
> As to her hands, feet and neck, x-rays of the hands and feet establish only *mild* degenerative changes and a cervical spine MRI showed *minimal* abnormalities with no spinal, foraminal or facet disease. Any concerns for neck, hand and foot pain are adequately addressed in the assigned residual functional capacity limitation to sedentary work.

(Tr. 16 (internal citation omitted).) Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

The ALJ did not explain the basis for his conclusion that limiting Taylor to sedentary work would sufficiently accommodate the effects of her upper extremity limitations, including her hand pain. Accordingly, the ALJ failed to build an accurate and logical bridge between the evidence and his finding.

Although Taylor did not state what additional limitations the ALJ should have included in the RFC assessment to address her upper extremity limitations, the ALJ did not include *any* limitations that address these issues. Or at least he did not explain how the limitations he included addressed these issues. Given the above-stated medical evidence that supports Taylor's upper extremity limitations, on remand the ALJ should include upper extremity limitations in the RFC assessment or provide a good reason for not doing so.

### 4.2.3. Interpersonal Deficits

Taylor argues that the RFC assessment did not adequately address her interpersonal deficits. (ECF No. 11 at 18-19.) She argues that a limitation to "occasional interaction with coworkers and the public" does not address her moderate limitation in interacting with others because "there is no indication that limiting the <u>frequency</u> of Taylor's contact in any way adequately accounts for her interpersonal deficits." (*Id.* at 19 (emphasis in original).) In response, the Commissioner argues that the ALJ accounted for her social limitations and explained why additional limitations were not supported by the record. (ECF No. 14 at 11-12.) The Commissioner further argues that "[Taylor] cites her own complaints of a low frustration tolerance, aggressive urges, anger, and that her symptoms negatively impacted her relationships with others," but the ALJ did not ignore the implications of these complaints on "her ability to work with others." (*Id.* at 12.)

To support his finding that Taylor had a moderate limitation in interacting with others, the ALJ stated,

> [Taylor] reports problems getting along with others, irritability, and limited social engagement. However, the record supports only a moderate limitation. [Taylor] possesses the capacity for positive and appropriate social interaction. Treating providers routinely describe her as pleasant and cooperative. [Taylor] also possesses the capacity for establishing and maintaining relationships. She reports having several friends and regular contact with her God-sister. [Taylor] also remains able to engage in activities that take her out into the community and require her to interact well with others. For example, she has reported that she occasionally attends church.

(Tr. 18 (internal citations omitted).)

Taylor again does not articulate what additional limitation(s) the ALJ should have included in the RFC assessment to account for her interpersonal deficits. However, she appears to be arguing that a limitation that addressed the *quality* of her interactions, rather than *quantity*, would have been more appropriate. *See Wartak v. Colvin*, No. 2:14-CV-401-PRC, 2016 WL 880945, at *7 (N.D. Ind. Mar. 8, 2016).

Dr. Phillips found that Taylor would be moderately limited in her "ability to interact appropriately with the general public," (Tr. 122), but she was "[n]ot significantly limited" in her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes" (Tr. 123). And Dr. Pape opined that

> [i]t is reasonable [Taylor] may have moderate limitations in accepting instructions and responding appropriately to criticism. [Taylor] would do best in a work environment that is low stress, slow paced, and criticism is given in a calm and supportive manner. Evidence shows [Taylor]

interacting appropriately in public, maintain appropriate standards of cleanliness, and the ability to ask for help.

(Tr. 106 (reprinted as original).)

The RFC assessment regarding Taylor's interpersonal deficits is supported by substantial evidence. Therefore, the court finds no error in this part of the ALJ's decision.

### 4.3. Medical Opinion Evidence

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (unpublished) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). While "[a]n ALJ must offer good reasons for discounting a treating physician's opinion," *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted), courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (citing *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010) (unpublished)).

### 4.3.1. Dr. David Coran, Spine Surgeon

Taylor argues that the ALJ erred by giving "little weight" to the opinions of her spine surgeon, Dr. David Coran. (ECF No. 11 at 21-22.) She argues that the ALJ cherry-picked the record. (*Id.* at 22.). In response, the Commissioner argues that "the ALJ did not ignore abnormal findings in examinations, nor did he ignore limitations caused by [Taylor's] fibromyalgia or pain[.]" (ECF No. 14 at 15.) And regarding the permanency of Taylor's restrictions, the Commissioner argues that, when Dr. Coran opined that Taylor's symptoms would be permanent, he "[did] not mean his restrictions would be permanent, only that [Taylor] would likely continue to experience symptoms, including pain, after her fusion surgery." (*Id.* at 16.)

Dr. Coran was Taylor's spine surgeon and performed surgery on her in October[1] 2012. (Tr. 26.) He subsequently imposed restrictions on when she could return to work and on her capabilities. He opined she could not work from September 24, 2012, to November 30, 2012, due to "severe pain, [and] surgery scheduled 10-13-12." (Tr. 1361.) After her surgery and pursuant to multiple subsequent orders, Dr. Coran restricted her from working until May 31, 2013. (Tr. 1356-60.) Starting on June 1, 2013, Dr. Coran said she could return to work but was subject to certain restrictions. (Tr. 1356.) In July he imposed work restrictions like lifting a maximum of ten pounds, bending a maximum of

---

[1] Although the ALJ states her surgery was in September, other forms assert that the surgery was on October 3, 2012. (*See, e.g.*, Tr. 1361.)

Case 2:19-cv-00359-WED   Filed 04/22/20   Page 19 of 33   Document 16

zero to two times per hour, and limiting her to a sitting job with an ergonomic station. (Tr. 1353.) He also opined that she could only work four hours per day. (*Id.*) The restrictions were continually extended and ultimately in place until December 31, 2013. (Tr. 1351.)

> To support giving "little weight" to Dr. Coran's opinions, the ALJ stated:
>
> First, the record shows that [Taylor] was able to return to full-time work prior [sic] December 2013. For example, September 2013 examinations showed tenderness to the cervical spine and limited lumbar spine range of motion, but she was in no acute distress and demonstrated fairly well preserved cervical spine range of motion and intact strength in the upper and lower extremities. While he noted [Taylor] to ambulate with a crutch on examination and he had prescribed [Taylor] a cane, he did not note [Taylor] to require an assistive device for her to work.
>
> Second, there is no indication that Dr. Coran intended for his restrictions to be permanent. In January 2013, not wholly inconsistent with the assigned residual functional capacity, Dr. Coran indicated that he thought when she was completely healed, [Taylor] would be limited [sic] light level work with a twenty-pound lifting capacity and a limited capacity for repetitive bending or twisting with a need to alternate positions from sitting to standing every thirty minutes to relieve pain. Then, in May, he indicated that with the limitations set out above, [Taylor] could return to work with gradual increases from four-hour to eight-hour shifts. Also, as Dr. Coran stated at his last appointment with [Taylor] in September 2013, he renewed her work restrictions for three months, discharged her from his care, and told her that if she required re-evaluation for her capacity for work, she should contact him.

(Tr. 26 (internal citations omitted).)

The fact that someone is not in "acute distress" does not mean she is capable of the rigors of full-time employment. "The key is not whether one has improved …, but whether they have improved enough to meet the legal criteria of not being classified as

disabled." *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014). *See also Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1030 (E.D. Wis. 2004) ("One can be stable and yet disabled."). Accordingly, the fact that Taylor was not in acute distress was not a good reason for discounting Dr. Coran's opinions.

The court agrees that Dr. Coran did not intend for his restrictions to be permanent. However, that fact does not explain why Dr. Coran's opinions are entitled to little weight. *See Henderson v. Barnhart*, 205 F. Supp. 2d 999, 1008 (E.D. Wis. 2002) ("The ALJ's decision must also demonstrate the path of [his] reasoning and the evidence must lead logically to [his] conclusion.") (citing *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996)).

On remand, the ALJ shall reevaluate Dr. Coran's opinions in light of the relevant evidence in the record. If the ALJ decides that Dr. Coran's opinions are not entitled to controlling weight, he shall give "good reasons" supported by the record for discounting them.

### 4.3.2. Dr. Richard Hariman, Treating Provider

Taylor argues that the ALJ erred by giving little weight to the opinions of Dr. Richard Hariman, her treating rheumatologist. (ECF No. 11 at 23-24.) In July 2017 Dr. Hariman filled out a form entitled, "Auto Immune Disorder Medical Assessment Form." (Tr. 2068-71.) He opined that Taylor would be off task twenty percent of the workday and "would … be expected to perform full time work on a sustained basis" at only eighty percent efficiency. (Tr. 2069.) He further opined that she could only walk two city blocks

"without rest or severe pain," (*id.*), could rarely lift ten pounds and could lift less than ten pounds only occasionally (Tr. 2071).

> To support giving "little weight" to Dr. Hariman's findings, the ALJ stated,
>
> These assessments [concerning time off task and maintaining persistence and pace/efficiency] conflict with her presentation as pleasant and in no distress and the mental status examination findings showing logical and coherent thoughts and fair to intact attention, concentration, memory, insight and judgment. Dr. Harriman [sic] imposed very significant exertional limitations (e.g., walk two blocks at a time, stand for ten minutes at a time, occasionally lift and carry less than ten pounds and rarely lift ten pounds). These limitations are incompatible with the limited findings on imaging and examination (e.g., pleasant, no distress, relative good strength, sensation, reflexes, and gait). For these reasons, the undersigned also does not adopt Dr. Harriman's [sic] more restrictive postural and manipulative limitations.
>
> In addition, Dr. Harriman's [sic] opinion that [Taylor] requires ready access to a bathroom does not gather support in the record as there is no indication in the record that [Taylor] suffers from a digestive or genitourinary condition or associated symptoms requiring that allowance. Finally, Dr. Harriman's [sic] opinion that [Taylor] would be absent two days per month and require frequent unscheduled breaks is speculative and has no basis in the record given the relative good examination findings as described.

(Tr. 26-27 (internal citations omitted).) Taylor argues that "her presentation to treating mental health providers with whom [she] has therapeutic relationships does little to inform one as to her likely functioning if put into a full time, competitive work environment." (ECF No. 11 at 24.) The Commissioner argues that "[t]he lack of consistency with objective and other evidence was a good reason to decline to give Dr. Hariman's opinion great weight." (ECF No. 14 at 16.)

As noted above, the ALJ tended to focus on Taylor's normal findings at the mental status exams, such as "pleasant and in no distress," and ignored findings that suggest a disability. Some of the findings that suggest a disability in the record may give support to Dr. Hariman's suggested restrictions. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)).

Accordingly, on remand the ALJ shall reevaluate Dr. Hariman's opinions in light of the relevant evidence in the record. If the ALJ decides that Dr. Hariman's opinions are not entitled to controlling weight, he shall give "good reasons" supported by the record for discounting them.

### 4.3.3. Dr. Kathryn Kreig, Treating Psychiatrist

Taylor argues that the ALJ erred by not giving more weight to the opinions of her treating psychiatrist, Dr. Kathryn Kreig. (ECF No. 11 at 23-24.) The ALJ explained the amount of weight he decided to give the opinions of Dr. Kreig:

> The undersigned gives little weight to the opinion of treating psychiatrist, Kathryn Kreig M.D. First, Dr. Kreig opined that [Taylor] would need to lie down three or more hours during a typical eight-hour period; would be absent/need to leave work more than four days per month; would require frequent unscheduled breaks; and would be unable to consistently and independently leave her home at least three days per month. These assessments are speculative and without basis in the record. The record does not document frequent cancellations or no shows for appointments

and treating providers have not noted [Taylor] to be extremely fatigued or in persistent distress or otherwise offered clinical findings or aggressive treatment recommendations that would support such extreme limitations. Also, these limitations are inconsistent with Dr. Kreig's later finding that [Taylor] is generally able to maintain her activities of daily living, as she indicated [Taylor] has only a mild limitation in this area.

Second, Dr. Kreig opined [Taylor] would have frequent difficulty interacting with others and a marked restriction in social functioning. This conflicts with [Taylor's] consistent presentation as pleasant and cooperative and her ability to establish and maintain relationships.

Third, Dr. Kreig opined [Taylor] would be off task more than twenty percent of the day, would be able to efficiently perform full time work only 50% of the time, and would be unable to start or complete even simple work tasks without an unusual level of supervision at least three times per day. This assessment is incompatible with her later finding that [Taylor] has only a mild limitation in concentration, persistence or pace. Further, as discussed, [Taylor's] ability to perform work within the contours of the assigned residual functional capacity gathers support in the examination findings showing cooperative and pleasant behavior, appropriate grooming, normal speech, logical and coherent thoughts, and fair to intact attention, concentration, memory, insight and judgment. These same findings as well as the absence of highly intensive mental health treatment undermine Dr. Kreig's opinion that [Taylor's] mental disorders had resulted in marginal adjustment.

…

The undersigned grants little weight to the opinion of Dr. Kreig from April 2016. She had only seen [Taylor] on two occasions and declined to respond to most questions on the mental impairment questionnaire.

(Tr. 28-29, 30 (internal citations omitted).)

Taylor argues that being able to attend appointments does not translate into an ability to work full-time. (ECF No. 11 at 24.) In response, the Commissioner argues that "[t]he ALJ's assessment, however, encompassed several of the factors outlined in the

regulations such as supportability and consistency." (ECF No. 14 at 17.) The Commissioner further argues that "[e]ven if the ALJ's consideration of attendance at her appointments was not correct, … the ALJ gave many other reasons for not giving controlling or great weight to [Taylor's] treating physicians." (*Id.*)

The ALJ cites inconsistencies within Dr. Kreig's opinion. "While internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion, *Knight [v. Chater]*, 55 F.3d [309], 314 [(7th Cir. 1995)] ('Medical evidence may be discounted if it is internally inconsistent with other evidence' in the record)," the ALJ must still "adequately articulate his reasoning for discounting [the doctor's] opinion." *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). The ALJ has not done so here because he failed to build a logical bridge between the evidence and his conclusions. For example, Taylor's ability to maintain appointments says little about her ability to maintain competitive, full-time employment. And the fact that Taylor has not received "highly intensive mental health treatment" does not undermine Dr. Kreig's findings of mental health impairments. And the fact that Taylor was "pleasant" at her mental status examinations does not mean she is capable of full-time employment.

Accordingly, on remand, the ALJ shall reevaluate Dr. Kreig's opinions in light of the relevant evidence in the record. If the ALJ decides that Dr. Kreig's opinions are not entitled to controlling weight, he shall give "good reasons" supported by the record for discounting them.

### 4.3.4. Lisa Roehl, Treating Therapist

Finally, Taylor argues that the ALJ erred by giving "little weight" to the opinions of her treating therapist, Lisa Roehl. "[E]vidence from 'other sources' such as therapists must be considered because such evidence can establish the severity of an impairment and its effects on the claimant's ability to function." *Pfeiffer v. Astrue*, 576 F. Supp. 2d 956, 963 (W.D. Wis. 2008) (citing 20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06-03p). "Although [the therapists'] opinions may not be sufficient by themselves to establish the existence of an impairment, they can be given some weight, especially where they are based on long and frequent contact with the claimant and are consistent with acceptable medical sources who are also treating the claimant." *Retlick v. Astrue*, 930 F. Supp. 2d 998, 1005 (E.D. Wis. 2012).

In April 2016 Roehl filled out a form entitled, "Mental Impairment Questionnaire (RFC & Listings)." (Tr. 1379-84.) She indicated that Taylor would be "[u]nable to meet competitive standards" in the following areas: "Maintain attention for two hour segment;" "Maintain regular attendance and be punctual within customary, usually strict tolerances;" "Sustain an ordinary routine without special supervision;" "Work in coordination with or proximity to others without being unduly distracted;" "Complete a normal workday and workweek without interruptions from psychologically based symptoms;" and "Perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 1381.) Roehl also opined that Taylor's "psychiatric condition

exacerbate[s] [her] experience of pain or any other physical symptom[.]" (Tr. 1382.) And Roehl found Taylor had marked limitations in "Restriction of activities of daily living," "Difficulties in maintaining social functioning," and "Difficulties in maintaining concentration, persistence or pace." (Tr. 1383.)

In February 2017 Roehl filled out another form, this one entitled, "Mental Impairment Medical Source Statement." (Tr. 1467-70.) On this form she opined that Taylor would have to "lie down due to fatigue or related symptoms" three or more hours during a normal eight-hour workday (Tr. 1467), would miss more than four days of work per month because of medical treatment or a "bad day" (Tr. 1468), would be off-task more than 20 percent of the workday (Tr. 1469), and could only perform at 50 percent efficiency at "persisting with tasks and maintaining work pace/efficiency (*id.*).

Regarding Roehl's opinion the ALJ stated:

For the same reasons [referencing the discussion of Dr. Kreig's opinion], the undersigned ascribes little weight to the February 2017 opinion of treating therapist, Lisa Roehl MA LPC. Her assessment is in lockstep with that of Dr. Kreig. As explained, Dr. Kreig's opinion is internally inconsistent, speculative and without basis in the record, and incongruent with medical evidence of record.

Similarly, the undersigned affords little weight to the April 2016 opinion of Ms. Roehl. She opined [Taylor] to be unable to be seriously limited to unable to [sic] meet competitive standards in the mental abilities and aptitudes needed to perform unskilled work. Her assessment is also internally inconsistent. For instance, her finding that [Taylor] is seriously limited in her ability to carry out simple instructions conflicts with her finding in the same opinion that [Taylor] would be able to carry out detailed instructions. Moreover, her finding that [Taylor] does not possess the social and cognitive function to perform unskilled work within the operative residual

functional capacity is inconsistent with the examination findings as stated. This evidence also undermines Ms. Roehl's determination that [Taylor] has marked limitation in performing her activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. Ms. Roehl's assessment of three episodes of decompensation does not draw support in the record as [Taylor] has not required psychiatric hospitalization or other highly structured or intensive mental health treatment.

Furthermore, Ms. Roehl's conclusion that [Taylor] would be absent more than four days per month is speculative and not consistent with the good examination findings and the absence of intensive treatment. Finally, Ms. Roehl's opinion rests in part on [Taylor's] reports regarding her physical impairments. Ms. Roehl is a therapist, not a medically trained physician, and she did not evaluate [Taylor's] physical conditions.

(Tr. 29 (internal citations omitted).)

As a therapist Roehl is not an "acceptable medical source." SSR 06-3p. Having said that, although Roehl's opinion is not entitled to controlling weight, the ALJ is still required to consider the 20 C.F.R. § 404.1527(c) factors in determining how much weight to give her opinion.

In discussing Roehl's February 2017 opinion the ALJ asserted that her opinion is like Dr. Kreig's, which the ALJ opined was "internally inconsistent, speculative and without basis in the record, and incongruent with medical evidence of record." (Tr. 29.) The ALJ does not explain further and did not cite to evidence as to how *Roehl's* opinion is "internally inconsistent, speculative and without basis in the record." Accordingly, the ALJ has not supported that part of his opinion with substantial evidence. On remand, the ALJ shall reevaluate Roehl's February 2017 opinion in light of the relevant evidence in

the record. If the ALJ decides that Roehl's opinions are not entitled to more weight, he shall give "good reasons" supported by the record for discounting them.

With regard to Roehl's April 2016 opinion, the ALJ stated it is internally inconsistent, providing examples with specific citations to the record. For example, Roehl opined that Taylor would be "seriously limited" in her ability to "[c]arry out very short and simple instructions" (Tr. 1381) but that she did not have any limitations in her ability to "[c]arry out detailed instructions" (Tr. 1382). This internal inconsistency may provide a good reason for not giving controlling weight to Roehl's opinion, but the ALJ still has to explain his reasoning for giving it little weight. *See Clifford*, 227 F.3d at 871. The ALJ then provided two other reasons for giving Roehl's opinion "little weight:" her findings about Taylor's absences is "speculative and inconsistent with the good examination findings and the absence of intensive treatment," and her opinions are somewhat based on Taylor's subjective reports of her physical symptoms even though Roehl never physically evaluated her.

Accordingly, the ALJ provided multiple reasons for giving Roehl's April 2016 opinion "little weight" in addition to stating it was internally inconsistent. Because these reasons were supported by substantial evidence, the ALJ did not err by giving her April 2016 opinion "little weight."

### 4.4. Request for Different ALJ on Remand

Finally, Taylor argues that, if the case is remanded, the court should recommend that her case be assigned to a different ALJ. (ECF No. 11 at 25-28.) She argues that the ALJ's questioning regarding her desire to become pregnant "goes too far" and its relevance is "questionable." (*Id.* at 27.) She also calls the ALJ's line of questioning "callous and inappropriate." (*Id.* at 25.) The Commissioner argues that showing bias is "a very high bar," which Taylor has not reached. (ECF No. 14 at 18.)

"To whom a case is remanded is generally within the province of the Secretary's responsibility." *Travis v. Sullivan*, 985 F.2d 919, 924 (7th Cir. 1993). When a court remands a matter for rehearing, the Appeals Council will generally vacate the prior final decision of the Commissioner and the same ALJ who initially heard the matter will hold a de novo hearing. *See* Hearings, Appeals, and Litigation Law Manual (HALLEX), sec. I-2-8-18 A., available at https://ssa.gov/OP_Home/hallex/hallex.html. However, under certain circumstances the court can either order or recommend a new ALJ on remand. "Remand to a different ALJ is appropriate in certain cases in order to ensure that a full and fair evaluation is given on remand." *Lidy v. Sullivan*, 745 F. Supp. 1411, 1418 (N.D. Ind. 1989).

An ALJ *must* be replaced on remand if the court finds that the ALJ "demonstrated a degree of bias … that would disqualify him as a matter of due process …." *United States v. Thouvenot, Wade & Moerschen, Inc.*, 596 F.3d 378, 386 (7th Cir. 2010). If "there is no evidence of bias or partiality by the original ALJ in the case," then the district court

exceeds its authority if it orders a new ALJ to hear the case on remand. *Travis*, 985 F.2d at 924. But even in the absence of sufficient evidence of bias to justify a court ordering that a new ALJ be assigned to hear a case on remand, under certain circumstances a court may *recommend* that another ALJ on remand consider the applicant's claim. *Thouvenot, Wade & Moerschen, Inc.*, 596 F.3d at 386. Those circumstances include when "[t]he tone of the administrative law judge's opinion suggest[ed] that she may have an unshakable commitment to the denial of th[e] applicant's claim," *Sarchet v. Charter*, 78 F.3d 305, 309 (7th Cir. 1996), or when the ALJ "twice failed to produce an acceptable decision," *Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1094-95 (E.D. Wis. 2009). *See also Lidy*, 745 F. Supp. at 1418 (stating that the court will only consider remanding the case to a new ALJ if "(1) the plaintiff has requested remand to a different ALJ; and (2) there is some legitimate, compelling reason to have a different ALJ perform the ordered task on remand.") (internal footnote omitted).

Having reviewed the transcript of the hearing before the ALJ, the court finds an insufficient basis for recommending that this matter be reassigned to a different ALJ on remand. In response to questions about how her desire to have a child was consistent with her position that she is incapable of full-time employment, Taylor provided a multi-faceted explanation. Once she did, perhaps the ALJ should have moved on to another subject sooner than he did. But the court does not read the transcript as reflecting

"badgering" of Taylor on the subject or that the ALJ possessed an "unshakable commitment" to denying Taylor's claim.

### 4.5. Direct Award of Benefits

In her statement of relief Taylor states, "Because of errors discussed above, reversal and award of benefits to Taylor is warranted, as the work preclusive opinions of her treating medical providers are well supported by the Record[.]" (ECF No. 11 at 28.) In a footnote on the last page of his brief, the Commissioner states this is a "cursory request" and argues that "[Taylor] has not shown that a remand for a new decision, much less an award of benefits, is warranted." (ECF No. 14 at 19, n.4.)

"An award of benefits is appropriate … only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011).

Because all essential factual issues have not been resolved and the record does not adequately establish the plaintiff's entitlement to benefits, the court concludes that a direct award of benefits is not appropriate.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 22nd day of April, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge